**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MAHMOUD M. HEGAB,
*Plaintiff-Appellant,*
v.
LETITIA A. LONG, Director, National Geospatial-Intelligence Agency; NATIONAL GEOSPATIAL-INTELLIGENCE AGENCY,
*Defendants-Appellees.*

No. 12-1182

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(1:11-cv-01067-JCC-IDD)

Argued: October 26, 2012

Decided: April 25, 2013

Before NIEMEYER, MOTZ, and DAVIS, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Davis concurred. Judge Motz wrote a separate opinion concurring in the judgment. Judge Davis wrote a separate concurring opinion.

---

## COUNSEL

**ARGUED:** Sheldon I. Cohen, SHELDON I. COHEN & ASSOCIATES, Oakton, Virginia, for Appellant. Bernard G. Kim, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellees. **ON BRIEF:** Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellees.

---

## OPINION

NIEMEYER, Circuit Judge:

When Mahmoud Hegab, an employee of the National Geospatial-Intelligence Agency ("NGA") with a top secret security clearance, informed the agency of his marriage to Bushra Nusairat, the NGA conducted a reinvestigation into his security clearance. Based on new information, the NGA revoked Hegab's security clearance.

Hegab commenced this action under the Administrative Procedure Act against the NGA and its Director to reverse the NGA's decision, to reinstate his security clearance, and to award him back pay, benefits, and attorneys' fees. In his complaint, he alleged that he presented "overwhelming evidence" to refute the NGA's conclusions and that the NGA staff "did not take the time or effort to review" the facts or "assumed that anything with the name 'Islam' associated with it is a subversive terrorist organization." He alleged that "[i]f the latter is true . . . [his] constitutionally protected rights of freedom of religion, freedom of expression, and freedom of association" were violated. The district court dismissed Hegab's complaint under Federal Rule of Civil Procedure 12(b)(1), concluding that it did not have subject-matter jurisdiction to review a security clearance determination.

We conclude that Hegab's speculative and conclusory allegations of constitutional violations were essentially recharacterizations of his challenge to the merits of the NGA's security clearance determination and that we do not have jurisdiction to review such a determination. Accordingly, we affirm.

I

After obtaining the necessary top secret security clearance, Hegab began work for the NGA as a financial/budget analyst on January 4, 2010. The NGA, a member of the U.S. Intelligence Community and a Department of Defense Combat Support Agency, produces geospatial intelligence in support of national security, and all NGA employees must possess a top secret security clearance with "sensitive compartmented information access."

During his orientation at the NGA, Hegab informed a security officer that after the investigation for his security clearance had been completed but before he had begun work, he had married Bushra Nusairat. This information prompted the agency to reinvestigate Hegab. By a memorandum dated November 2, 2010, the NGA notified Hegab that a preliminary decision had been made to revoke his security clearance, effective November 18, 2010. On January 7, 2011, Hegab was placed on unpaid administrative leave.

The proposed revocation was based on information about Nusairat, as well as earlier information that Hegab had provided during his initial security clearance investigation. The Statement of Reasons that the NGA gave to Hegab listed the facts on which it relied. It stated (1) that Hegab, his parents, and his siblings held dual citizenship with the United States and Egypt; (2) that Hegab still possessed an Egyptian passport and that it would require contact with foreign national government officials for Hegab to renounce his Egyptian citizenship and turn in his passport, which would increase the potential

that he would be monitored by foreign intelligence services; (3) that Hegab stated that he was 80% certain that his wife held dual citizenship with Jordan; (4) that Hegab reported "continuing contact with multiple foreign nationals (including relatives), some of whom reside outside of the Continental United States"; (5) that Hegab had reported residing in Egypt from May 2004 to November 2007; (6) that Hegab's spouse had attended and graduated "from the Islamic Saudi Academy, whose curriculum, syllabus, and materials are influenced, funded, and controlled by the Saudi government"; and (7) that "[i]nformation available through open sources identifies [Hegab's] spouse as being or having been actively involved with one or more organizations which consist of groups who are organized largely around their non-United States origin and/or their advocacy of or involvement in foreign political issues." The Statement of Reasons concluded that this information "presents an elevated foreign influence risk that is problematic and unacceptable to the national security of the United States."

After receiving the Statement of Reasons, Hegab requested and received the file supporting the NGA's proposal to revoke his security clearance. The file contained the information that Hegab had submitted during his initial security clearance, as well as the information the agency had subsequently obtained about his wife, including: (1) statements of various organizations concerning the Saudi Islamic Academy, which she had attended; (2) a photograph believed to be of her taken at an anti-war protest in Washington, D.C., depicting her carrying a sign bearing the website identification of an organization named "ANSWER" and stating, "War No—Act Now to Stop War and End Racism"; (3) a statement indicating that after graduating from the Islamic Saudi Academy in 2005, she attended George Mason University, where she studied "Global Affairs, International Development, Diplomacy and Global Governance, Islamic Studies," and was the president of a student group called Students for Justice in Palestine; and

(4) information concerning her employment at a non-profit organization called Islamic Relief USA.

Hegab submitted a detailed response to the NGA to explain the evidence, but the agency nonetheless issued a final decision on March 4, 2011, revoking Hegab's security clearance. The decision informed Hegab that:

> Your response has mitigated the concerns of citizenship, foreign contact, overseas employment and residency, as well as your spouse's education at the Islamic Saudi Academy. However, the information provided does not mitigate your spouse's current affiliation with one or more organizations which consist of groups who are organized largely around their non-United States origin and/or their advocacy of or involvement in foreign political issues. This concern elevates the potential for conflicts of interest between your obligation to protect sensitive or classified United States information and technology and your desire to help a foreign person, group, or country by providing that information.

Hegab appealed the decision to the NGA Personnel Security Appeals Board, submitting a written response and 85 exhibits focused on Islamic Relief USA. And on July 26, 2011, he appeared with counsel at a hearing before the Board and presented additional evidence about Islamic Relief USA. The next day, the Board issued its decision affirming the agency's revocation of Hegab's security clearance and advising Hegab that the Board "determined that your written appeal and the information provided during your personal appearance failed to mitigate security concerns."

Seeking review of the Board's decision, Hegab commenced this action against the NGA and its Director, Letitia Long, in her official capacity, alleging that the revocation of his security clearance "was based solely on [his] wife's religion, Islam,

her constitutionally protected speech, and her association with, and employment by, an Islamic faith-based organization" and that the NGA's actions therefore violated his constitutional rights. In six counts, he alleged violations of the Free Speech Clause of the First Amendment, the Free Exercise Clause of the First Amendment, the freedom of association protected by the First Amendment, the Due Process Clause of the Fifth Amendment, a right to privacy under the Ninth Amendment, and a right to equal protection under the First, Fifth, Ninth, and Fourteenth Amendments.

The NGA and its Director filed a motion to dismiss the complaint for lack of subject-matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). Following a hearing on the motion, the district court dismissed the complaint without prejudice under Rule 12(b)(1) for lack of subject-matter jurisdiction. The court found that "Hegab's claims, though framed as constitutional violations, concern the merits of NGA's decision to revoke his security clearance," and "[a]bsent clear congressional directive, which Hegab fails to identify, such review is flatly prohibited by [*Department of Navy v.*] *Egan* [484 U.S. 518 (1988)] and Fourth Circuit precedent," referring to *Reinbold v. Evers*, 187 F.3d 348, 357-58 (4th Cir. 1999), and *Guillot v. Garrett*, 970 F.2d 1320, 1326 (4th Cir. 1992).

This appeal followed.

## II

Both Hegab and the NGA appear to agree with the proposition that no one has a right to a security clearance and that the grant of a security clearance is a highly discretionary act of the Executive Branch. They also recognize that the Fourth Circuit has concluded that security clearance determinations are generally not subject to judicial review. As the Supreme Court observed in *Egan*, "the protection of classified informa-

tion must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it." *Egan*, 484 U.S. at 529. Thus, when we have been asked to review security clearance decisions, we have concluded that courts are generally without subject-matter jurisdiction, recognizing that a court should not be put in the position of second-guessing the discretionary judgment of an executive agency assessing national security risks. *See Reinbold*, 187 F.3d at 357-58; *Becerra v. Dalton*, 94 F.3d 145, 148-49 (4th Cir. 1996); *Guillot*, 970 F.2d at 1326. The *Egan* Court amplified the reasons for this, stating, "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." *Egan*, 484 U.S. at 529. Rather, the agency head charged with the protection of classified information "'should have *the final say* in deciding whether to repose his trust in an employee who has access to such information.'" *Id.* (emphasis added) (quoting *Cole v. Young*, 351 U.S. 536, 546 (1956)). Harkening to separation of powers concerns, the Court emphasized that "'the courts have traditionally shown the utmost deference to Presidential responsibilities.' Thus . . . courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Id.* at 530 (quoting *United States v. Nixon*, 418 U.S. 683, 710 (1974)); *see also Baker v. Carr*, 369 U.S. 186, 217 (1962) (finding questions to be political and nonjusticiable when, among other things, there is an absence of "judicially discoverable and manageable standards for resolving" the question; the question cannot be decided "without an initial policy determination of a kind clearly for nonjudicial discretion"; or it is impossible for a court to "undertak[e] independent resolution without expressing lack of the respect due coordinate branches of government").

Therefore, as the parties recognize, it is well established in our circuit that absent a specific mandate from Congress providing otherwise, federal courts are generally without subject-

matter jurisdiction to review an agency's security clearance decision. *See Reinbold*, 187 F.3d at 357-58; *Becerra*, 94 F.3d at 148-49; *Guillot*, 970 F.2d at 1325-26.

Hegab argues, however, that his complaint should not be dismissed by application of those established principles because, as he contends, even security clearance decisions must be subject to judicial protection of individual rights guaranteed by the Constitution. He maintains that because his complaint has alleged constitutional claims, the claims should be adjudicated in court, citing *Webster v. Doe*, 486 U.S. 592 (1988). In *Webster*, the governing statute authorized the CIA Director to terminate employees "whenever [the Director] shall deem such termination necessary or advisable in the interests of the United States." *Id.* at 594. The Court held that this statutory provision did not preclude judicial review of "colorable constitutional claims arising out of the actions of the Director." *Id.* at 603. It reached this conclusion "to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.*

This case thus raises the issue of where to draw the line, if there is such a line, between the political question of reviewing the merits of a security clearance decision and the judicial question of whether an Executive Branch agency violated an individual's constitutional rights when denying or revoking his or her security clearance.

In the cases we have decided, we have left open the question of whether we can review a security clearance decision *even where* an individual presents a colorable claim that the agency's decision violated his or her constitutional rights. *See Reinbold*, 187 F.3d at 358 (noting that "it is arguable that we could review an agency's security clearance decision in the limited circumstance where the agency's security clearance decision violated an individual's constitutional rights"); *Jamil v. Sec'y, Dep't of Def.*, 910 F.2d 1203, 1209 (4th Cir. 1990)

("Whether, however, review of [an] alleged denial of constitutional rights is reachable by a court in the light of *Egan* presents a difficult question that we do not need to reach in this appeal" because "nothing in the record, other than [the plaintiff's] conclusory assertion," supported his constitutional claims). And other courts have not come to a consensus on this question. *See, e.g.*, *El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 183-85 (3d Cir. 2010) (holding that the court had jurisdiction to review plaintiff's claims that an agency violated his constitutional rights in the process of revoking his security clearance, but concluding that any claim that requires reviewing the merits of the security clearance decision fails to state a claim); *Oryszak v. Sullivan*, 576 F.3d 522, 526 (D.C. Cir. 2009) (noting that while courts may have jurisdiction over the review of security clearance claims, such claims other than constitutional claims fail to state a claim); *Dorfmont v. Brown*, 913 F.2d 1399, 1401-04 (9th Cir. 1990) (holding that courts lack jurisdiction to review the merits of security clearance determinations, except possibly in the limited case where an individual has a colorable constitutional claim); *Hill v. Dep't of Air Force*, 844 F.2d 1407, 1411 (10th Cir. 1988) (suggesting that *Egan* would be "hardly worth the effort" if it could be "bypassed simply by invoking alleged constitutional rights").

But in this case, we need not decide whether and where the line should be drawn because we conclude that Hegab's complaint merely challenges the merits of the NGA's security clearance decision and his conclusory constitutional claims are unsuccessful attempts to circumvent the undisputed proposition that we will not review the merits of a security clearance decision.

Hegab's complaint is factually fulsome, setting forth in detail—over a span of some 15 pages—the communications between him and the NGA during a period from January 2010 to September 2011. He alleged that after the investigation for his security clearance had been completed and he had been

granted clearance, he married Nusairat and so advised the NGA. That fact prompted the agency to conduct another investigation and to conclude, based on this investigation and other materials that Hegab had previously submitted, that Hegab's security clearance should be revoked. Before reaching its final decision, the NGA gave Hegab its reasons and identified the evidence giving it concern. Hegab responded with additional evidence and explanations in an effort to rebut the NGA's evidence and reasoning. While the evidence he presented allayed some of the NGA's concerns, the NGA adhered to its preliminary decision to revoke his clearance, explaining that his wife's affiliation with "one or more organizations which consist of groups who are organized largely around their non-United States origin and/or their advocacy of or involvement in foreign political issues" created potential conflicts with Hegab's "obligation to protect sensitive or classified United States information."

Hegab appealed the decision to the NGA Personnel Security Appeals Board and presented 85 exhibits to the Board in support of his appeal, contending that his evidence was "overwhelming" in refuting the NGA's conclusions. The Board, after conducting a hearing, nonetheless affirmed the agency's decision.

Based on these historical facts, Hegab alleged in his complaint that the "NGA's security staff either did not take the time or effort to review the readily available information previously presented to it, or other open source information, *or* that the security staff assumed that anything with the name 'Islam' associated with it is a subversive terrorist organization." (Emphasis added). And he alleged further that the NGA's decision "reflects, most generously, a failure to examine and a misunderstanding of the facts and, less generously, an anti-Islamic bias among the NGA security staff." His complaint then concluded, "*[i]f* the latter is true," the NGA's "actions and conclusions would be in violation of plaintiff's and his wife's constitutionally protected rights of freedom of reli-

gion, freedom of expression, and freedom of association." (Emphasis added). Based on these allegations, the complaint set forth in six counts various causes of actions grounded in different provisions of the Constitution. But each count alleged the same factual basis:

> The revocation of plaintiff's security clearance and access to classified information by defendant was based solely on plaintiff's wife's religion, Islam, her constitutionally protected speech, and her association with, and employment by, an Islamic faith-based organization.

The complaint alleged no facts to support the claim that anyone at the NGA in fact held the hypothesized bias or said anything that indicated such a bias. To the contrary, the agency's alleged bias is stated as the speculative product of an ambivalent allegation in the complaint that the NGA security staff *either* failed to take the time or effort to review the available information *or* were biased against Islam.

These allegations amount to no more than a challenge to the merits of the agency's security clearance determination, implying that the determination was irrational and unsupported by the evidence. Indeed, Hegab alleged as much, stating that he provided "overwhelming" evidence to refute the reasons given by the NGA. But these are exactly the type of claims that we have held are beyond the subject-matter jurisdiction of a district court. As we explained in *Reinbold*, decided in a similar circumstance:

> Reinbold essentially concedes that, to decide his Fourth Amendment claim on the merits, we must determine whether the NSA wrongly suspended his SCI security clearance. This is precisely the type of review that *Egan* prohibits.

*Reinbold*, 187 F.3d at 358 (distinguishing claims only focused on the merits from constitutional claims).

Hegab's constitutional allegations are conclusory only, resting on his disagreement with the NGA's decision on the merits. Reasoning from the premise that the NGA's decision was wrong—in particular, that it was irrational and unsupported by the evidence—he concludes that the decision must therefore have been the product of an unconstitutional bias. The conclusion, however, does not follow, and no independent facts are alleged to support such a bias. When that is understood, it becomes apparent that Hegab's constitutional claims depend entirely on his disagreement with NGA's review of the evidence and his conclusion that the agency did not make its decision for the reasons that it gave and therefore must have acted from an unconstitutional bias. This type of speculative claim, however, does not state a colorable constitutional claim. *See Reinbold*, 187 F.3d at 358-59; *Jamil*, 910 F.2d at 1209. Hegab's constitutional claims are in substance merely creative recharacterizations of his allegation that the NGA made the wrong decision and that its decision was irrational and unsupported by the evidence. Such a challenge goes to the merits of the security clearance determination, the review of which does not fall within our jurisdiction. *See Reinbold*, 187 F.3d at 357-58.

In its security clearance determination, the NGA concluded that Hegab had failed to mitigate its concern of "an elevated foreign influence risk that is problematic and unacceptable to the national security of the United States," and this conclusion is one in which the NGA "should have the final say," *Egan*, 484 U.S. at 529, and in which courts should not intrude, *id.* at 530.

Accordingly, the judgment of the district court is

*AFFIRMED.*

DIANA GRIBBON MOTZ, Circuit Judge, concurring:

I join in holding that we lack jurisdiction to review the National Geospatial-Intelligence Agency's ("NGA's") revoca-

tion of Mahmoud Hegab's security clearance. Like Judge Davis, however, I believe Hegab's complaint states a colorable constitutional claim; such is now the holding of the court. I also agree with Judge Davis, albeit on somewhat different grounds, that precedent prohibits us from reviewing the merits of the NGA's individualized security clearance determination, even in light of Hegab's colorable constitutional challenge. Accordingly, I concur in the judgment.

As to Hegab's allegation of a constitutional violation, he asserts that the NGA revoked his security clearance because of concern regarding his wife's "current affiliation with [an] . . . organization[ ] which . . . [is] organized largely around [its] non-United States origin and/or the advocacy of or involvement in foreign political issues," *i.e.*, her employment by Islamic Relief USA. Hegab alleges that this revocation violated his constitutional rights because it "was based solely on [his] wife's religion, Islam, her constitutionally protected speech, and her association with, and employment by, an Islamic faith-based organization." These allegations certainly suffice to state a claim of discrimination that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In *Department of Navy v. Egan*, 484 U.S. 518 (1988), however, the Supreme Court held that federal courts generally lack jurisdiction to review an agency's decision to deny or revoke an individual's security clearance. For this reason, we have dismissed for lack of jurisdiction claims that an agency's security clearance determination violated a petitioner's statutory rights. *See, e.g.*, *Becerra v. Dalton*, 94 F.3d 145, 148-49 (4th Cir. 1996) (court lacked jurisdiction to review Title VII claim arising from Navy's security clearance decision); *Guillot v. Garrett*, 970 F.2d 1320, 1323-26 (4th Cir. 1992) (court lacked jurisdiction to review appellant's claim that Navy's denial of his security clearance violated Rehabilitation Act of 1973).

If *Egan* stood alone, clearly it would require dismissal here too. But in *Webster v. Doe*, 486 U.S. 592 (1988), decided the same term as *Egan*, the Supreme Court appeared to hold, over vigorous dissents, that federal courts have jurisdiction to review *constitutional* challenges to security-related employment decisions. *Id.* at 601-605. In *Webster*, the employee challenged as violative of his constitutional rights the CIA's decision to discharge him because he was homosexual, in keeping with its policy of treating homosexuality as a potential security threat. *Id.* at 595, 602. The Court found that, while the CIA had discretion to discharge an employee under the National Security Act, that statute did not preclude judicial review of an employee's constitutional claims. *Id.* at 603-604.

Prior to today, we have been able to avoid attempting to reconcile *Egan* and *Webster*. *See, e.g.*, *Jamil v. Sec'y, Dep't of Def.*, 910 F.2d 1203, 1209 (4th Cir. 1990). But we must do so in this case because we cannot assess Hegab's constitutional claims without reviewing the merits of the NGA's decision. It may well be that, if presented with the task of reconciling these two cases today, the Supreme Court would hold, in accordance with Justice Scalia's dissent in *Webster* and Judge Davis's concurrence in the case at hand, that any challenge to an agency's security clearance determination raises a non-justiciable political question. However, to date the Supreme Court has not so held.

Given the Court's direction that we follow its cases until expressly overruled, *Agostini v. Felton*, 521 U.S. 203, 237 (1997), and the possibility of reconciling *Egan* and *Webster* without holding *Webster* a dead letter, I follow a more conservative approach. In light of the holding in *Egan*, at most *Webster* permits judicial review of a security clearance denial only when that denial results from the application of an allegedly unconstitutional *policy*. Since Hegab alleges no unconstitutional policy but only an assertedly unconstitutional individualized adverse determination, his claim fails.

I recognize that some of the language in *Webster* sweeps broadly enough to suggest that judicial review extends to any constitutional challenge, but nothing in *Webster* indicates that it overruled *Egan*, which the Court issued only a few months earlier. And a court could assess the constitutionality of the CIA policy at issue in *Webster* without delving into the merits of an individualized security clearance determination, which *Egan* clearly prohibited.

In sum, although *Webster* may authorize us to review constitutional challenges to security clearance *policies*, it does not provide us with jurisdiction in this case, where Hegab makes no allegation of an assertedly unconstitutional policy. I note that this limited approach accords with that taken by those of our sister circuits to address the question of how to reconcile *Egan* and *Webster*. *See El-Ganayni v. Dep't of Energy*, 591 F.3d 176, 183-86 (3d Cir. 2010) (finding judicial review of constitutional claims appropriate only to the extent it would not require court to review merits of agency's decision to revoke petitioner's security clearance); *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 289-90 (D.C. Cir. 1993) (finding *Egan* did not bar judicial review of constitutional challenge to questionnaire used in making security clearance determinations but distinguishing case from those "challenging, on constitutional grounds, discretionary judgments regarding a particular employee's security clearance"). This approach may not gain an employee his reinstatement, but it certainly could gain him money damages and attorneys' fees.

DAVIS, Circuit Judge, concurring:

I concur in the majority opinion but with an important difference in emphasis; hence, I offer these further thoughts.

The National Geospatial-Intelligence Agency (the "NGA") concluded, after a thorough investigation of Appellant Mahmoud Hegab's background and qualifications, that its award of a top secret security clearance (an essential requirement of

his federal employment with the agency) was warranted as "clearly consistent with the interests of national security." *See* Appellees' Br. at 4 (quoting Executive Order 12968, § 3.1(b), 60 Fed. Reg. 40245 (Aug. 7, 1995)). Hegab had spent several months on the job, and after a further investigation and review of Hegab's background and qualifications, the NGA determined, to the contrary, that a top secret security clearance was *not* "clearly consistent with the interests of national security." Consequently, having lost his top secret security clearance, Hegab lost his job.

What changed?

Reading the material allegations of the complaint in the light most favorable to Hegab, the only thing that changed is he got married to a dual citizen Muslim activist who, before their marriage, robustly exercised her First Amendment rights of speech and association.[1] I do not regard Hegab's allegations as "conclusory"; rather, I regard them as "colorable" within the contemplation of our precedents.[2] Unlike the alle-

[1]Hegab alleges that subject matter jurisdiction over this case rests on the general federal question statute, 28 U.S.C. § 1331, *see* J.A. 5 ("this matter arises under the Constitution of the United States"), and that his claims are cognizable by virtue of "the government's waiver of immunity under the Administrative Procedure Act," *id.* Indisputably, sound authority supports Hegab's assertion that we have subject matter jurisdiction over the constitutional claims he alleges. *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178 (D.C. Cir. 2006) (holding that federal question jurisdiction exists over First Amendment claim by individual against the FTC, but finding claim legally insufficient); *Hubbard v. Envtl. Prot. Agency*, 949 F.2d 453 (D.C. Cir. 1991) (affirming judgment for injunctive relief against the EPA, and remanding for consideration of an award of back-pay, after trial of First Amendment retaliation claim instituted by rejected applicant for employment).

[2]It is at least arguable, as the majority opinion intimates, that Hegab essentially pled himself out of his causes of action by including such an abundant narrative of the factual bases for his disagreement with the agency's decision. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) ("Rule 12(b)(6) dismissal is appropriate where the allegations con-

gations in many extant cases raising claims of unconstitutional security clearance revocations,[3] the gravamen of Hegab's complaint is the alleged denial of equal protection, in violation of the Fifth Amendment.

Thus, I would conclude on this record that, even after the most grudging application of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), Hegab has stated cognizable claims of unconstitutional adverse action by a governmental agency. There is an impenetrable barrier, however, to the possibility that Hegab's claims might proceed past the pleading stage. Specifically, Hegab's claims raise a non-justiciable political question—i.e., whether the agency revoked his security clearance on legitimate national security grounds, or whether the decision "was based solely on [Hegab's] wife's religion, Islam[;] her constitutionally protected speech[;] and her [mere] association with, and employment by, an Islamic faith-based organization." J.A. 21.

"Pursuant to the political question doctrine, the judiciary is deprived of jurisdiction to assess decisions exclusively com-

tradict the claim asserted.") (citing Charles Alan Wright & Arthur R. Miller, Fed. Practice & Procedure § 1357 (2d ed. 1990)); *see also Bennett v. Schmidt*, 153 F.3d 516, 519 (7th Cir. 1998) ("Litigants may plead themselves out of court by alleging facts that establish defendants' entitlement to prevail."). But lawyers not infrequently plead claims "on information and belief", *e.g.*, *Kush v. Rutledge*, 460 U.S. 719, 721 & n.1 (1983), and courts generally understand that some ultimate facts, *e.g.*, the existence of an invidious motivation for facially (but pretextual) non-discriminatory adverse actions, can be pled, conformably within the strictures of Federal Rule of Civil Procedure 11, only in such a manner. At bottom, that is exactly what Hegab has done here, somewhat inartfully.

[3]*See, e.g.*, *Reinbold v. Evers*, 187 F.3d 348, 358 (4th Cir. 1999) (noting that the plaintiff-appellant had alleged that his seizure, debriefing, and ejection from a Navy facility had "violated his rights as guaranteed under the Fourth Amendment," "not that the suspension of his . . . security clearance amounted to a constitutional violation").

mitted to a separate branch of government." *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 407 n.9 (4th Cir. 2011).[4] Rudimentary separation of powers standards demonstrate the exclusive commitment of national security clearance decisions to the executive branch; that commitment could not be more pervasive or more clear. *See, e.g.*, *Becerra v. Dalton*, 94 F.3d 145, 148 (4th Cir. 1996) ("Security clearances are within the Executive's purview, and therefore, 'unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.'") (citing *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988)). Manifestly, the requirement that a security clearance be afforded a government employee only where it is "clearly consistent with the interests of national security" simply does not admit of judicial determination; it is a political question, not a judicially reviewable question.

This case points out (once again) the difficulty facing lawyers and lower federal courts trying to make jurisprudential sense of the Supreme Court's *dictum* in *Webster v. Doe*, 486 U.S. 592, 603 (1988), over dissents by Justice O'Connor and Justice Scalia, that the Court desired to avoid "the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." As the majority opinion points out, in this Circuit, we have strained mightily to pay heed to that *dictum*, usually by holding, as the majority opinion here does, that a plaintiff has failed to allege a "colorable constitutional

[4]Notably, "the [Supreme] Court has not announced whether it views the [political question doctrine] as constitutional"—and thus, jurisdictional—"or prudential." Erwin Chemerinsky, *Federal Jurisdiction* 45 (5th ed. 2007). Although we have said political questions rob us of jurisdiction, *see Taylor*, 658 F.3d at 407 n.9, other courts are not so certain. *Cf. Oryszak v. Sullivan*, 576 F.3d 522, 527 (D.C. Cir. 2009) (Ginsburg, J., concurring) (observing that "it is important to distinguish among failure to state a claim, a claim that is not justiciable, and a claim over which the court lacks subject matter jurisdiction").

claim" and that therefore subject matter jurisdiction is lacking. *Reinbold v. Evers*, 187 F.3d 348, 358 (4th Cir. 1999).[5] None of the six justices comprising the majority in *Webster* remain on the Court; it would be fair to express uncertainty as to the continuing viability of the twenty-five year old *Webster dictum*.

For now it suffices to observe that cases such as this one bring to mind the story of the three umpires sitting in a tavern discussing how they make calls on pitches when working home plate. The first said, "I call them as I see them." The second said, "I call them as they are." The third said, "They ain't nothin' until I call 'em." As important as constitutional protections are for all of our fellow citizens, and as critical as the Third Branch's role is in the vindication of those protections, the President and his designees, and no other decision-

[5]A number of courts have reconciled *Egan* and *Webster* by reasoning that *Webster* allows courts to review constitutional challenges to the *process* for making security clearance decisions, but *Egan* bars courts from reviewing the *merits* of those decisions. *See, e.g.*, *El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 183 (3d Cir. 2010) ("We read *Egan* and *Webster* together as holding that Article III courts have jurisdiction to hear 'constitutional claims arising from the clearance revocation process,' even though the merits of that revocation cannot be reviewed.") (citing *Webster*, 486 U.S. at 603–04).

I have grave doubt that many federal employees whose security clearance is revoked care much about the *procedures* used to do so; they care about their *clearance* (thus, their jobs and their reputations, and not necessarily in that order). *See Hill v. Dep't of Air Force*, 844 F.2d 1407, 1412 (10th Cir. 1988) ("[T]he district court made no finding that the Air Force violated any particular procedure; and even if such a finding had been made the remedy would have been a remand for the purpose of compliance with applicable procedures, not an order requiring reinstatement of Hill's clearance."). Accordingly, I find this attempted reconciliation, based on reasoning that a court could not "review the merits of the decision to revoke [the plaintiff's] security clearance," but could "exercise jurisdiction over [his] constitutional claims and review them to the extent that [the court] [could] do so without examining the merits of that decision," *El-Ganayni*, 591 F.3d at 183, largely incoherent in any real-life application.

makers, have the authority of the third umpire in security clearance decisions.

On the above understandings, I concur in the majority opinion.